**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:

                                                  Chapter 11
                                      Case No.: 0:21-bk-15007-PDR

**STAMATIKE GLARENTZOS**,

       Debtor.

_____/

**SN SERVICING CORPORATION, AS SERVICER FOR**
**U.S. BANK TRUST, N.A., AS TRUSTEE OF THE BUNGALOW SERIES**
**IV TRUST'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY**
**OR, IN THE ALTERNATIVE, FOR ADEQUATE PROTECTION**

**Any interested party who fails to file and serve a written response to this motion within 14 days after the date of service stated in this motion shall, pursuant to Local Rule 4001-1(C), be deemed to have consented to the entry of an order granting the relief requested in the motion.**

**SN SERVICING CORPORATION, AS SERVICER FOR U.S. BANK TRUST, N.A., AS TRUSTEE OF THE BUNGALOW SERIES IV TRUST** ("Secured Creditor"), its successor and/or assigns, by its undersigned counsel hereby files this Motion for Relief From the Automatic Stay, pursuant to Federal Rules of Bankruptcy Procedure 4001 and 9014 to lift the automatic stay imposed by 11 U.S.C. § 362(a) for cause under 11 U.S.C. § 362(d), or in the alternative, for adequate protection pursuant to 11 U.S.C. § 361, to exercise its non-bankruptcy rights with respect to certain real properties mortgaged to Secured Creditor.  In support thereof, the Secured Creditor states as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

2.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## SUMMARY OF THE RELIEF SOUGHT

By this Motion, Secured Creditor seeks relief from the automatic stay under 11 U.S.C. § 362(a) pursuant to: (i) 11 U.S.C. § 362(d)(1), because "cause" exists as a result of Secured Creditor not receiving adequate protection for its secured interest in the real properties located at *932 North Northlake Drive, Hollywood, FL 33019* (the "Property") securing the obligations due and owing to Secured Creditor; or, alternatively, (ii) 11 U.S.C. § 362(d)(1), because the Debtor has little to no equity in the Property and, (ii) the Property is not necessary for an effective reorganization. If relief from the automatic stay is not granted, in the alternative, this Motion seeks an order conditioning the stay on the receipt of adequate protection payments.

## PROCEDURAL BACKGROUND

**A.    The Bankruptcy Filing.**

3.    On May 24, 2021, the Debtor, Stamatike Glarentzos (the "Debtor") filed a Voluntary Petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code. This is the third Chapter 11 petition filed by Debtor since 2017.

4.    On May 25, 2021, the Court issued the Notice of Incomplete Filings Due ("Notice of Deficiency").

5.    Pursuant to the Notice of Deficiency, the Debtor was directed to cure all filing deficiencies by June 7, 2021.

6.    On June 9, 2021, the Debtor untimely filed the required schedules and statements curing the filing deficiencies.

7.    On July 9, 2021, Secured Creditor filed its secured claim [Proof of Claim no. 4-1] (the "Claim") which reflects a total secured claim in the amount of $1,584,306.04, with total arrearage amount of $777,221.87, and denoting the current on-going mortgage payment amount of $9,619.62.

8.    As of the filing of this Motion, the Debtor has not filed a proposed Chapter 11 Plan and as such, the Debtor's intention as to the Property is unknown.  Debtor has objected to Secured Creditor's claim to which opposition is forthcoming.

**B.    The secured interests and amounts due on the Property.**

9.    On February 19, 2003, a Flex Pay Fixed/Adjustable Rate Note was executed by Matina Glarentzos ("Matina Glarentzos") and delivered to Indymac Bank, F.S.B., in the original principal amount of Eight Hundred Seventy Thousand Six Hundred Twenty One and 32/100 Dollars ($870,621.32) (the "Note") for the purchase of the Property.

10.    The amount owed to Secured Creditor is secured by that certain mortgage executed by Matina Glarentzos and John Glarentzos ("John Glarentzos")(collectively the "Borrowers") dated February 19, 2003, and recorded on April 9, 2003 as CFN# 102803830, in O.R. Book 34907, Page 1161 of  the Public Records of Broward County, Florida, (the "Mortgage").

11.    Secured Creditor is the lienholder and secured creditor of the Property by virtue of the Assignment(s) of Mortgage attached to the Mortgage.  The Note, Mortgage and Assignment(s) of Mortgage constitute the Loan Documents (collectively, the "Loan Documents").  True and correct copies of the Loan Documents are attached to this Motion as **Composite Exhibit "A"**.

12.    On January 8, 2009, a foreclosure action was commenced against the Debtor in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, *Foreclosure Case No. CACE-09-001231*, and which said foreclosure action ultimately resulted in the entry of a Consent Final Judgment of Mortgage Foreclosure, entered on August 21, 2014, in the amount of $1,246,648.89 (the "Final Judgment").   A true and correct copy of the Final Judgment is attached as **Exhibit "B"**.

13.    A Declaration in Support of the Motion for Relief From Stay is attached hereto as **Exhibit "C".**

14.    On August 17, 2015, Debtor filed his first Chapter 11 Petition as case number 15-24839-RBR.  On May 3, 2016, Debtor filed an Out of Time Motion for Referral to Mortgage Modification Mediation with Secured Creditor's predecessor in interest OneWest Bank. OneWest participated fully.   The final Mortgage Modification Mediation conference held on June 23, 2017 where no agreement was reached.  Debtor being dismissed on June 30, 2017 with a 180 day bar to refiling.

15.    On April 20, 2018, Debtor filed his second Chapter 11 Petition as case number 18-14679-JKO.  Following multiple motions from both Secured Creditor's predecessor and the Debtor as to the claim, a mediation occurred on October 17, 2019.  In that mediation, the parties reached an agreement to settle then current disputes.  Pursuant to the terms of the agreement, Debtor moved to dismiss his second Chapter 11 case which was granted on November 13, 2019.

16.    The Debtor is not a borrower to the original Note or Mortgage.  Secured Creditor has agreed to work with Debtor as an interest of the Property through the prior filing (18-14679-JKO) the mediations invoked in the prior filings, and this instant Chapter 11 filing.

17.     The Debtor and Borrowers have committed an Event(s) of Default for failure to pay any monthly installment payment due under the terms of the Note.

18.     As of the Petition Date, Secured Creditor is owed $1,584,306.04, plus interest at the prevailing statutory legal interest rate of interest pursuant to Section 55.03 of Florida Statutes, plus additional attorney's fees and court costs associated with the filing of this instant Motion, as well as any other amounts permitted under the Loan Documents.

19.     The Final Judgment confirms Secured Creditor's interest in the Property legally described as follows:

**LOT SEVEN (7) LESS THE NORTH 30 FT. THEREOF DEEDED FOR STREET RIGHT-OF-WAY, BLOCK SIXTY-SIX (66), HOLLYWOOD LAKES SECTION, PLAT BOOK 1, PAGE 32, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, AND ALSO ALL THAT PARCEL OF LAND DESCRIBED AND BOUNDED AS FOLLOWS: BEING A PART OF PIERCE STREET AND PART OF BLOCK SEVENTY (70) OF HOLLYWOOD LAKES SECTION, BOUNDED ON THE NORTH BY THE SO. LINE OF SAID LOT SEVEN (7), ON THE SO. BY BLOCK SEVENTY ONE (71), OTHERWISE DESCRIBED AS NORTH LAKE OF SAID HOLLYWOOD LAKES SECTION, ON THE EAST BY THE EAST LINE OF SAID LOT SEVEN (7), EXTENDED IN A SOUTHERLY DIRECTION AND ON THE WEST BY THE WEST LINE OF SAID LOT SEVEN (7) EXTENDED IN A SOUTHERLY DIRECTION AS SHOWN ON THE PLAT OF HOLLYWOOD LAKES SECTION, BEING ALL THAT PARCEL OF LAND LYING SOUTH OF SAID LOT SEVEN (7) EXTENDING TO SAID NORTH LAKE.**

20.     Secured Creditor asserts that the Property lacks equity and that the total estimated just/market valuation of the Property, as per the Broward County Property Appraiser's Office, is $1,504,040.00. (the "Valuation").  A copy of the Valuation is attached hereto as **Exhibit "D"**.

21.     Secured Creditor asserts that the Property is subject to diminishing and decreasing in value and continues to do so by virtue of the continued use of the Property by the Debtor and/or unknown party(ies) in interest, without payments to Secured Creditor and given the current market history of the areas in which the Property is located.

22.    Secured Creditor seeks state court rights with respect to security interest in all of the rental proceeds generated from the Properties.

23.    It is universally accepted that "Section 362(d)(1) and 362(d)(2) are disjunctive; the Court *must* lift the stay if the movant prevails under either of the two grounds." *In re Kaplan Breslaw Ash*, 264 B.R. 309, 321 (Bankr. S.D.N.Y. 2001) (emphasis added); *see also In re Albany Partners*, 749 F.2d 670, 673 (11th Cir. 1984) (noting the alternative grounds for stay relief).

24.    In the present case, Secured Creditor is entitled to stay relief under § 362(d)(1), since Secured Creditor's interest in the Properties is not being adequately protected. Additionally, Secured Creditor is entitled to relief from the stay under § 362(d)(2) because there is no equity in the Properties and the Properties is not necessary for an effective reorganization of the Debtor.

25.    Section 362(d)(1) of the Bankruptcy Code provides for lifting of the automatic stay "for cause," and a movant bears the initial burden to demonstrate that "cause exists."  11 U.S.C. § 362(d)(1).  As explained by the Bankruptcy Courts, "[u]pon motion to lift or modify the automatic stay, burden of proof is a shifting one, with the movant having the burden of making initial showing of 'cause,' and debtor having the ultimate burden of proof on all issues other than debtor's equity in property." *In re Telegroup, Inc.*, 237 B.R. 87, 91 (Bankr. D.N.J. 1999); *see also* 11 U.S.C. § 362(g).

26.    A debtor's failure to provide adequate protection of a creditor's interest is a classic basis for granting relief from the stay for cause.  *See In re McGaughey*, 24 F.3d 904, 906 (7th Cir. 1994); s*ee also, e.g.*, *In re Telegroup*, 237 B.R. at 91.  A creditor can establish its case quantitatively, i.e., by demonstrating the decline in the value of the creditor's interest in the debtor's property.

27.     Secured Creditor is entitled to enforce the Final Judgment.

28.     In the instant case, Secure Creditor is entitled to adequate protection in any form as the collateral continues to depreciate in value due to continued, uncompensated use by the Debtor.  Accordingly, absent adequate protection, cause exists to lift the automatic stay so that Secured Creditor may exercise its non-bankruptcy rights with respect to the Property. Additionally, Secured Creditor is entitled to relief from the stay under § 362(d)(2) because there is no equity in the Property and the Property is not necessary for an effective reorganization of the Debtor.

29.     Secured Creditor asserts that the total payoff amount as of June 23, 2021 is $1,591,151.13 and that the loan has since accrued additional interest, late charges, as well as, additional attorneys' fees and court costs as a result of filing of the instant Motion and seeks recovery of fees and costs associated with the filing of the instant Motion.

30.     If the Court lifts the stay that it should also waive the requirement of Bankruptcy Rule 4001(a)(3), therefore allowing an Order to be effective upon this Honorable Court's signature and Secured Creditor to pursue its *in rem* remedies without further delay.

31.     Secured Creditor further requests that upon entry of an order granting relief requested that it be exempted from further compliance with Fed. Rule Bankr. P. 3002.1 in the instant bankruptcy case.

32.     A copy of a proposed Order is attached hereto as **Exhibit "E"**.

**WHEREFORE**, Secured Creditor, respectfully requests that this Court enter an Order (i) granting Secured Creditor's relief from the automatic stay as to SN Servicing Corporation, as Servicer for U.S. Bank Trust, N.A., as Trustee for the Bungalow Series IV Trust, so as to allow Secured Creditor to enforce its *in rem* remedies against the Property, (ii) providing for state court

*Case No.: 0:21-bk-15007-PDR*

rights with respect to security interest in the rental proceeds generated by the Property; (iii) waiving the time requirements under Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure so that it may immediately continue and complete its state court foreclosure proceedings, and allow the state court to enter all necessary orders, judgments, and decrees associated therewith, (iv) binding the Debtor in the event of a conversion; and (v) together with such other relief that this Honorable Court may deem just and proper.

**Dated:  September 1, 2021.**

Respectfully submitted,

**GHIDOTTI ⎸ BERGER, LLP**
*Attorneys for Secured Creditor*
1031 North Miami Beach Blvd.
North Miami Beach, FL 33162
Telephone: (305) 501.2808
Facsimile: (954) 780.5578

By: /s/ Christophal Hellewell
      Christophal Hellewell, Esq.
      Florida Bar No. 114230
      chellewell@ghidottiberger.com

## <u>CERTIFICATE PURSUANT TO LOCAL RULE 9011-4 (B)(1)</u>

I certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court as set forth in Local Rule 2090-1(A).

By:    /s/ Christophal Hellewell
        Christophal Hellewell, Esq.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on September 1, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

I also certify that the foregoing document is being served this day, either via transmission of Notice of Electronic Filing generated by CM/ECF or by first class U.S. Mail, upon the following as well as all interested parties on the attached creditor mailing matrix list.

*Debtor*
**Stamatike Glarentzos**
932 N Northlake Drive
Hollywood, FL 33019

*Debtor's Counsel*
**Peter D. Spindel, Esq.**
8306 Mills Drive, #458
Miami, FL 33183

*U.S. Trustee*
**Office of the US Trustee**
51 S.W. 1st Avenue, Suite 1204
Miami, FL 33130

*U.S. Trustee's Counsel*
**Adisley M Cortez Rodriguez, Esq.**
Office of the US Trustee
51 S.W. 1st Avenue, #1204
Miami, FL 33130

By: /s/ Christophal Hellewell
          Christophal Hellewell, Esq.

```
Label Matrix for local noticing     Synchrony Bank                       U.S. Bank Trust, N.A., as Trustee of the Bun
113C-0                              PRA Receivables Management, LLC       c/o SN Servicing Corporation
Case 21-15007-PDR                   PO Box 41021                         323 5th Street
Southern District of Florida        Norfolk, VA 23541-1021               Eureka, CA 95501-0305
Fort Lauderdale
Wed Sep  1 09:02:41 EDT 2021

American Express                    American Express National Bank       CIT Bank
c/o Becket & Lee                    c/o Becket and Lee LLP               POB 9013
POB 3001                            PO Box 3001                          Addison, TX 75001-9013
Malverne, PA 19355-0701             Malvern  PA 19355-0701


Capital One                         Capital One Bank (USA), N.A.         City of Hollywood
POB 30285                           by American InfoSource as agent      P.O. Box 229045
Salt Lake City, UT 84130-0285       PO Box 71083                         Hollywood, FL 33022-9045
                                    Charlotte, NC  28272-1083


Credit One Bank                     (p)DISCOVER FINANCIAL SERVICES LLC   Fla Dep Rev
POB 98873                           PO BOX 3025                          Attn: Bankruptcy Div
Las Vegas, NV 89193-8873            NEW ALBANY OH 43054-3025             POB 6668
                                                                         Tallahassee, FL 32314-6668


IRS                                 Office of the US Trustee             One West Bank
POB 7346                            51 S.W. 1st Ave.                     888 E Walnut St
Philadelphia, PA 19101-7346         Suite 1204                           Pasadena, CA 91101-1895
                                    Miami, FL 33130-1614


Rushmore Loan Management Services   (p)SN SERVICING CORPORATION          Synchony Bank
15480 Laguna Canyon Rd              323 FIFTH ST                         POB 965060
Irvine, CA 92618-2132               EUREKA CA 95501-0305                 Orlando, FL 32896-5060


Synchrony Bank                      US Bank Trust NA                     Peter D Spindel
c/o PRA Receivables Management, LLC SN Servicing Corporation             8306 Mills Dr. #458
PO Box 41021                        323 5th Street                       Miami, FL 33183-4838
Norfolk VA 23541-1021               Eureka, CA 95501-0305


Stamatike Glarentzos
932 N Northlake Dr
Hollywood, FL 33019-1113
```

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

```
Discover Bank                       SN Servicing                         End of Label Matrix
POB 15316                           323 5th St                           Mailable recipients   21
Wilmington, DE 19850                Eureka, CA 95501                     Bypassed recipients    0
                                                                         Total                 21
```

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA
CIVIL DIVISION
CASE NO. 09-01231

INDYMAC FEDERAL BANK, FSB, SUCCESSOR IN
INTEREST TO INDYMAC BANK, FSB

       Plaintiff,

vs.

MATINA GLARENTZOS AKA TINA GLARENTZOS AKA
STAMFIKE GLARENTZOS AKA STAMATIKI
GLARENTZOS AKA STAMAFIKE GLARENTZOS AKA
MARTINA GLARENTZOS AKA STAMATIKE MATINA
GLARENTZOS; JOHN GLARENTZOS; CITIBANK,
FEDERAL SAVINGS BANK; UNKNOWN PERSON(S) IN
POSSESSION OF THE SUBJECT PROPERTY;

       Defendants.

_____/

## AFFIDAVIT OF LOST NOTE

STATE OF Texas
COUNTY OF Williamson

    BEFORE ME, the undersigned authority, personally appeared _____ **Roger Stotts** _____

who, being first duly sworn, deposes and says:

    1.   Affiant is an employee of the servicing agent of the Plaintiff in the above styled action. Affiant's duties

include the supervision of the mortgage loan accounts of Plaintiff, including custody and control of original

mortgage loan instruments. Affiant has actual and personal knowledge of the facts stated herein and is authorized to

make this Affidavit.

    2.   The original Note, which was executed and delivered by MATINA GLARENTZOS AKA TINA

GLARENTZOS AKA STAMFIKE GLARENTZOS AKA STAMATIKI GLARENTZOS AKA STAMAFIKE

GLARENTZOS AKA MARTINA GLARENTZOS AKA STAMATIKE MATINA GLARENTZOS, on February

19, 2003, has been lost or destroyed. It is not presently in the custody or control of the Plaintiff or any of Plaintiff's

agents. Affiant is unaware of the time or circumstances surrounding the loss or destruction of said Note. The copy

of said Note attached to the Complaint is a true, correct and substantial copy of the lost or destroyed Note. The

persons named in the Complaint are the only persons known to Plaintiff, or any of its agents, who are interested for

or against reestablishment of the subject note.

File No.:

## COMPOSITE EXHIBIT "A"

3.    Plaintiff was in possession of the subject note and was entitled to enforce it when loss of possession occurred. The loss of possession was not the result of a transfer by Plaintiff or a lawful seizure. Plaintiff cannot reasonably obtain possession of the subject note because its whereabouts cannot be determined.

4.    Plaintiff hereby indemnifies the obligees under the subject note for any loss they may sustain by virtue of the loss of possession of the original note.

FURTHER AFFIANT SAYETH NAUGHT.

_____, Affiant
Roger Stotts

Title: _____ **Vice President** _____

Sworn to and subscribed before me this
__ day of ___January___, 2009.

_____
NOTARY PUBLIC, STATE OF ___Texas___
Commissioned Name of Notary Public _____
Personally known _x_ or produced identification
Type of Identification Produced _____

ELIZABETH HERNANDEZ
Notary Public, State of Texas
My Commission Expires
June 15, 2011

File No.:

Amended and Restated

# FLEX PAY FIXED/ADJUSTABLE RATE NOTE
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*)-Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

February 19, 2003                HOLLYWOOD                          Florida
[Date]                           [City]                            [State]

932    N NORTHLAKE DR, HOLLYWOOD, FL 33019
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $  870,621.32          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.500      %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on          June,   2007 I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on          March  1, 2033           , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at          INDYMAC BANK, F.S.B., P.O. BOX 78826, PHOENIX, AZ 85062-8826
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $   3,191.79        . This amount is a forty five and NO/1000ths            percent (      45.00   %) reduction of the payment amount that will be sufficient to repay the unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate set forth in Section 2. This amount may change.

(C) Payment Changes

My monthly payment will remain the same until June   1, 2012          , the month after the first Change Date, and will not change again until after I have made my 120th scheduled monthly payment unless it is required to change in accordance with Section 4(F) below.

If I have made less than 120 scheduled monthly payments, my new monthly payment will be in an amount equal to a forty five and NO/1000ths            percent (      45.00   %) reduction of the "Full Payment." This limitation will not apply under the circumstances described in Section 4(F). The Full Payment is the amount of the

monthly payment that would be sufficient to repay the unpaid balance that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.

If I have made 120 or more scheduled monthly payments, my new monthly payment will be in an amount equal to the Full Payment.

## 4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **May, 2012**                          , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market (LIBOR), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **two and 750/1000ths** percentage points ( **2.750** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **11.500** % or less than **2.750** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **11.500** %.

### (E) Additions to My Unpaid Balance

If I have made less than 120 scheduled monthly payments, on any monthly payment date the amount of my monthly payment could be less than the interest portion of the Full Payment. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid balance. The Note Holder will also accrue interest on the amount of this difference to my unpaid balance each month. The interest rate on the interest added to the balance will be the rate required by Section 4(C) above.

### (F) Limit on My Unpaid Balance: Increased Monthly Payment

My unpaid balance can never exceed a maximum amount equal to one hundred **ten and NO/100ths** percent ( **110.000** %) of the principal amount I originally borrowed. Because of my paying only limited monthly payments until I have made 120 scheduled monthly payments, the addition of unpaid interest to my unpaid balance under Section 4(E) above could cause my unpaid balance to exceed that maximum. In that event, on the date that the payment of my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment equal to the interest only portion of the Full Payment if I have made less than 120 scheduled monthly payments.

### (G) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (H) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

Form 5608 7/06 (FL)

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A) Late Charges for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of     15     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.
**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.
**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Loan No:
Form 5608 7/06 (FL)

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)  Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Form 5608 7/06 (FL)

**12. DOCUMENTARY TAX**
The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)     _____(Seal)
MATINA GLARENTZOS          -Borrower                                                      -Borrower

_____(Seal)     _____(Seal)
                                        -Borrower                                                      -Borrower

_____(Seal)     _____(Seal)
                                        -Borrower                                                      -Borrower

_____(Seal)     _____(Seal)
                                        -Borrower                                                      -Borrower

[Sign Original Only]

Form 5608 7/06 (FL)

**ALLONGE TO NOTE**

For purposes of further endorsement of the following described Note, the allonge is affixed and becomes a permanent part of said Note.

Loan Amount:          $875,000.00

Note Date:            2/19/2003

Borrower(s) Name:   MATINA GLARENTZOS

Address:              932  N NORTHLAKE DRIVE
                      HOLLYWOOD, FL  33019

*****************************************************************************************************

PAY TO THE ORDER OF ONEWEST BANK, FSB, WITHOUT RECOURSE

FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for Indymac Federal Bank, FSB, successor to Indymac Bank, F.S.B.

Sue North
Attorney In-Fact

## ALLONGE TO NOTE

For purposes of further endorsement of the following described Note, the allonge is affixed and becomes a permanent part of said Note.

**Loan Amount:** $875,000.00

**Note Date:** 2/19/2003

**Borrower(s) Name:** MATINA GLARENTZOS

**Address:** 932 N NORTHLAKE DRIVE
HOLLYWOOD, FL 33019

**************************************************************************************************

### PAY TO THE ORDER OF:

_____

**Without Recourse**

By: _~Sue North~_ _____

**Name:** Sue North
**Title:** Director
OneWest Bank, FSB

**Prepared by or under the supervision of:**

Brenda McAdams

*[Name of Natural Person]*

190 Technology Parkway

*[Street Address]*

Norcross, GA 30092

*[City, State Zip Code]*

**After recording please return to:**

IndyMac Bank, F.S.B. c/o Document
Management
*[Company Name]*

*[Name of Natural Person]*

155 North Lake Avenue

*[Street Address]*

Pasadena, CA 91101

*[City, State Zip Code]*

WILL CALL TRI-COUNTY FOR
**ROBERT E. O'NEIL P.A.**
2929 E. COMMERCIAL BLVD. - SUITE 702
FORT LAUDERDALE, FL. 33308
**WILL CALL NUMBER 163**

— *[Space Above This Line For Recording Data]* —————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated February 19, 2003 , together with all Riders to this document.

**(B)** **"Borrower"** is John Glarentzos and Matina Glarentzos, his wife

. Borrower is the mortgagor under this Security Instrument.

Loan No: ▉▉▉▉▉▉

**Florida Mortgage**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
—THE COMPLIANCE SOURCE, INC.— Page 1 of 15
www.compliancesource.com

Form 3010 01/01
14001FL 04/02
© 2002, The Compliance Source, Inc.



**(C)**    **"Lender"** is  IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a  Federal Savings Bank                        organized and existing under the laws of
United States of America          . Lender's address 155 North Lake Avenue,
Pasadena, CA 91101
Lender is the mortgagee under this Security Instrument.

**(D)**    **"Note"** means the promissory note signed by Borrower and dated    February 19, 2003
The Note states that Borrower owes Lender    eight hundred seventy five thousand and
NO/100ths                         Dollars (U.S. $    875,000.00    )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not
later than    March 1, 2033              .

**(E)**    **"Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(F)**    **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, and all sums due under this Security Instrument, plus interest.

**(G)**    **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower *[check box as applicable]*:

[X] Adjustable Rate Rider    [ ] Condominium Rider            [ ] Second Home Rider
[ ] Balloon Rider            [ ] Planned Unit Development Rider [ ] Biweekly Payment Rider
[ ] 1-4 Family Rider         [ ] Revocable Trust Rider
[ ] Other(s) *[specify]*

**(H)**    **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances
and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable
judicial opinions.

**(I)**    **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association or
similar organization.

**(J)**    **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer,
or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

**(K)**    **"Escrow Items"** means those items that are described in Section 3.

**(L)**    **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to,

Loan No:

or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M)**    **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N)**    **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)**    **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P)**    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the                                                    County

of                            Broward                              , which has a legal description of:
*[Name of Recording Jurisdiction]*                *[Type of Recording Jurisdiction]*

Legal description attached hereto and made a part hereof.

which currently has the address of                     932 N NORTHLAKE DRIVE
                                                                                  *[Street]*
                    HOLLYWOOD                        , Florida  33019                          ("Property Address"):
                       *[City]*                                        *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."

Loan No: ███████

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and

Loan No: 

assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Loan No:

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.— Page 5 of 15
www.compliancesource.com
Form 3010 01/01
14001FL 04/02
© 2002, The Compliance Source, Inc.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction,

Loan No:

provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has

abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument(b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a nonrefundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or

Loan No:

might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has– if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or

Loan No: ██████

Florida Mortgage–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 9 of 15

Form 3010  01/01
14001FL  04/02
© 2002, The Compliance Source, Inc.

not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borroweor any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the cosigner's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees fo services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not aprepayment charge is provided for under the Note). Borrower's

Loan No: ████

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                    Page 10 of 15
www.compliancesource.com

Form 3010 01/01
14001FL 04/02
© 2002, The Compliance Source, Inc.

acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument,

including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally

Loan No: ███████

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**    **Form 3010 01/01**
—THE COMPLIANCE SOURCE, INC.—     **Page 12 of 15**     14001FL 04/02
www.compliancesource.com               © 2002, The Compliance Source, Inc.

recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with EnvironmentalLaw. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of thesums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

*[Signatures on Following Page]*

Loan No:

Florida Mortgage–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 13 of 15
Form 3010 01/01
14001FL 04/02
© 2002, The Compliance Source, Inc.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

**Robert E. O'Neil**

Printed Name: _____ *[Please Complete]*

_____

**Kathleen A. Papa**

Printed Name: _____ *[Please Complete]*

X _____ (Seal)
Matina Glarentzos                              -Borrower
                                               *[Printed Name]*

Mailing Address  932 N NORTHLAKE DRIVE, HOLLYWOOD, FL 33019

X _____ (Seal)
John Glarentzos                               -Borrower
                                               *[Printed Name]*

Mailing Address  932 N NORTHLAKE DRIVE, HOLLYWOOD, FL 33019

_____ (Seal)
                                               -Borrower
                                               *[Printed Name]*

Mailing Address

_____ (Seal)
                                               -Borrower
                                               *[Printed Name]*

Mailing Address

——————— *[Acknowledgment on Following Page]* ———————

Loan N█████████

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3010 01/01
—THE COMPLIANCE SOURCE, INC.—                          Page 14 of 15                    14001FL 04/02
www.compliancesource.com                                                               © 2002, The Compliance Source, Inc.

State of Florida         §
                              §
County of Broward       §

      The foregoing instrument was acknowledged before me this 19th day of February 2003 *[date]* by Matina Glarentzos and John Glarentzos , her husband

                                                *[name of person acknowledging],*
who is personally known to me or who has produced driver license
*[type of identification]* as identification.

                          _____
                          Signature of Person Taking Acknowledgment

                          **Robert E. O'Neil**
                          Name Typed, Printed or Stamped

                          _____
                          Title or Rank

ROBERT E. O'NEIL
MY COMMISSION # CC 953020
EXPIRES: September 9, 2004
Bonded Thru Notary Public Underwriters

                          _____
                          Serial Number, if any

# EXHIBIT "A" TO MORTGAGE

Lot Seven (7) less the north 30 ft. thereof deeded for street
right-of-way, Block Sixty-Six (66), HOLLYWOOD LAKES SECTION,
Plat Book 1, Page 32, of the Public Records of Broward County,
Florida, and also all that parcel of land described and bounded
as follows:  Being a part of Pierce Street and part of Block
Seventy (70) of Hollywood Lakes Section, bounded on the north
by the So. line of said Lot Seven (7), on the So. by Block Seventy
One (71), otherwise described as NORTH LAKE of said HOLLYWOOD
LAKES SECTION, on the East by the East line of said Lot Seven (7),
extended in a southerly direction and on the West by the West line
of said Lot Seven (7) extended in a southerly direction as shown
on the plat of HOLLYWOOD LAKES SECTION, being All that parcel of
land lying south of said Lot Seven (7) extending to said North
Lake.

Loan No: ▇▇▇▇▇▇

# ADJUSTABLE RATE RIDER
MULTISTATE 12MAT        **Payment and Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this      19th      day of      February ,
2003        , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
IndyMac Bank, F.S.B., a federally chartered savings bank

(the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:

932 N NORTHLAKE DRIVE, HOLLYWOOD, FL 33019
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST
RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE
AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.
THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE
AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT
STATED IN THE NOTE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
I will make all payments under this Note in the form of cash, check or money order.
### 2. INTEREST
**(A) Interest Rate**
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will
pay interest at a yearly rate of      2.350      %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default
described in Section 7(B) of this Note.

**MULTISTATE ADJUSTABLE RATE RIDER**

Page 1 of 5

**-8480194** (0004)        ELECTRONIC LASER FORMS, INC. - (800)327-0545

**Form 3004 4/2000**

Initials: _JC G_

Loan No: ███████

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the first day of           April        ,  2003          ,
and on that day every month thereafter. Each date on which my interest rate could change is called an
"Interest Rate Change Date."  The new rate of interest will become effective on each Interest Rate Change
Date.

**(C) Interest Rate Limit**

My interest rate will never be greater than           10.950        %.

**(D) Index**

Beginning with the first Interest Rate Change Date, my interest rate will be
based on an Index. The "Index" is the Twelve-Month Average, determined as set
forth below, of the monthly yields on actively traded United States Treasury
Securities adjusted to a constant maturity of one year as published by the
Federal Reserve Board in the Federal Reserve Statistical Release entitled
"Selected Interest Rate (H.15)" ("the Monthly Yields").  The Twelve-Month
Average is determined by adding together the Monthly Yields for the most
recently available twelve months and dividing by 12.  The most recent Index
figure available as of 15 days before each Interest Rate Change Date is
called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new Index that is based upon
comparable information.  The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
        two and 600/1000ths                                       percentage point(s)
(            2.600          )% to the Current Index. Subject to the limit stated in Section 2(C) above,
the result of this addition will be my new interest rate until the next Interest Rate Change Date.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on
        April 1          ,  2003          . I will make these payments every month until I have paid
all the principal and interest and any other charges described below that I may owe under this Note. Each
monthly payment will be applied as of its scheduled due date and will be applied to interest before
principal. If, on         March,  2033                , I still owe amounts under this Note, I will pay these
amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    IndyMac Bank, F.S.B., P.O. Box 78826,
Phoenix, AZ 85062-8826
or at a different place if required by the Note Holder.

-8480194 (0004)                         Page 2 of 5                    Initials: _____
                                                                      Form 3004 4/2000

Loan No ████████

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 3,389.46 This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of April , 2004 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred TEN AND NO/100THS percent ( 110.000 %) of the principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

-8480194 (0004)                     Page 3 of 5                     Initials: _____

Form 3004 4/2000

Loan No

**(G) Required Full Payment**

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

-8480194 (0004)                    Page 4 of 5                    Initials: _____
                                                                   Form 3004 4/2000

Loan No:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Matina Glarentzos              -Borrower

_____ (Seal)
John Glarentzos               -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

-8480194 (0004)                    Page 5 of 5                    Form 3004 4/2000

18

When Recorded Return To:
OneWest Bank, FSB
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

CFN # 109192475
OR BK 46923 Pages 412-412
RECORDED 03/08/10 10:35:51
BROWARD COUNTY COMMISSION
DEPUTY CLERK 3405
#16, 1 Pages

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B., WHOSE ADDRESS IS 6900 BEATRICE DR. , KALAMAZOO, MI 49009, (ASSIGNOR), by these presents does convey, grant, sell, assign, transfer and set over the described mortgage together with the certain note(s) described therein together with all interest secured thereby, all liens, and any rights due or to become due thereon to OneWest Bank, FSB, WHOSE ADDRESS IS 888 E. WALNUT STREET , PASADENA, CA 91101, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).   Said Mortgage was made by JOHN GLARENTZOS AND MATINA GLARENTZOS and was recorded in Official Records of the Clerk of the Circuit Court of BROWARD County, Florida, in Book 34907, Page 1611 or Instr # 102803830
upon the property situated in said State and County as more fully described in said mortgage.

This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in any capacity.
Dated: 01/21/2010
FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B.


By:_____
    BRYAN BLY  ATTORNEY-IN-FACT
Whose address is 6900 BEATRICE DR., KALAMAZOO, MI 49009

Witnesses:


_____              _____
VILMA CASTRO                      DHURATA DOKO

STATE OF FLORIDA
COUNTY OF PINELLAS
I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State and County aforesaid to take acknowledgement appeared BRYAN BLY, personally known to me to be the ATTORNEY-IN-FACT of FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B., a corporation, and that she/he acknowledged executing the same freely and voluntarily under authority duly vested in him/her by said corporation. WITNESS my hand and official seal in the County and State last aforesaid this 21st day of January in the year 2010


_____
CRYSTAL MOORE   Notary Public
My commission expires:09/23/2013

Document Prepared By: Jessica Fretwell/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

CRYSTAL MOORE
Notary Public, State of Florida
Commission # DD 927242
Expires September 23, 2013
Bonded Through National Notary Assn.

Instr# 116126951 , Page 1 of 2, Recorded 10/22/2019 at 10:59 AM
Broward County Commission

PREPARED BY:
ASSIGNMENT DEPT.
FIRST AMERICAN MORTGAGE SOLUTIONS
1795 INTERNATIONAL WAY
IDAHO FALLS, ID 83402
AND WHEN RECORDED MAIL TO:
ATTN: DOC INTAKE
MERIDIAN ASSET SERVICES, INC.
3201 34TH STREET SOUTH
ST. PETERSBURG, FL 33711
**FLORIDA**
**COUNTY OF BROWARD**

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, CIT BANK, N.A. F/K/A ONEWEST BANK N.A. F/K/A ONEWEST BANK, FSB located at 75 N FAIR OAKS AVENUE, PASADENA, CA 91103, "Assignor," does hereby grant, bargain, assign, transfer and set over unto MTGLQ INVESTORS, L.P. located at 2001 ROSS AVE SUITE 2800, DALLAS, TX 75201, "Assignee," its successors and assigns, that certain indenture of Mortgage bearing the date of FEBRUARY 19, 2003 executed by JOHN GLARENTZOS AND MATINA GLARENTZOS, HIS WIFE, Mortgagor, and recorded on APRIL 09, 2003 in Book 34907 at Page 1611 as Clerk's File No. 102803830 in Public Records in the Office of the Clerk of the Circuit Court for BROWARD County, State of FLORIDA, upon the following described property:

**AS DESCRIBED IN SAID MORTGAGE REFERRED TO HEREIN**

TOGETHER WITH all rights accrued or to accrue under said Mortgage.

TO HAVE AND TO HOLD the same, unto the said Assignee, its successors and assigns, forever.

IN WITNESS WHEREOF, the undersigned has caused this Instrument to be executed on SEP 1 1 2019 .

CIT BANK, N.A. F/K/A ONEWEST BANK N.A. F/K/A ONEWEST BANK, FSB

MARISA BROYLES, VICE PRESIDENT

*All personally identifiable information was redacted prior to recording.

Page 1 of 2

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                COUNTY OF LOS ANGELES    ) ss.

On **SEP 1 1 2019**, before me, **YOLANDA EVETTE SMITH**, a Notary Public, personally appeared **MARISA BROYLES** who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity and that by his/her signature on the instrument the person(s), or the entity upon behalf of which the person acted, executed the instrument.

I certify under Penalty of Perjury, under the laws of the State of California, that the forgoing paragraph is true and correct. Witness my hand and official seal.

**YOLANDA EVETTE SMITH (COMMISSION EXP. 12/18/2022)**
**NOTARY PUBLIC**

YOLANDA EVETTE SMITH
Notary Public - California
Los Angeles County
Commission # 2271703
My Comm. Expires Dec 18, 2022

Instr# 116965516 , Page 1 of 1, Recorded 01/05/2021 at 09:13 AM
Broward County Commission

Recording Requested By:

Prepared By: Audrey B Trumble
855-369-2410
When recorded mail to:
CORELOGIC
PO BOX 9232
Coppell, TX 75019

Property Address:
932 N NORTHLAKE DRIVE
HOLLYWOOD, FL 33019

This space for Recorder's use

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is 2001 ROSS AVENUE, SUITE 2800, DALLAS, TX 75201 does hereby grant, sell, assign, transfer and convey unto U.S. BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE TIKI SERIES IV TRUST whose address is 7114 E Stetson Dr., Suite 250, Scottsdale, AZ 85251 all beneficial interest under a certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

Mortgagee:               INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK
Original Borrower(s):    JOHN GLARENTZOS AND MATINA GLARENTZOS, HIS WIFE
Date of Mortgage:        2/19/2003
Original Loan Amount:    $875,000.00
Recorded in Broward County, FL on: 4/9/2003, book OR 34907, page 1611 and instrument number 102803830

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on 11/18/2020

                                        MTGLQ INVESTORS, L.P. BY CORELOGIC
                                        SOLUTIONS, LLC ITS ATTORNEY IN FACT

                                        By: _____
Witness: _____Sabrina Wickline_____   Jessica Delpit
                                        Assistant Vice President

STATE OF TX

COUNTY OF Dallas

The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization, on this 11/18/2020 , by Jessica Delpit as Assistant Vice President for CORELOGIC SOLUTIONS, LLC AS ATTORNEY IN FACT FOR MTGLQ INVESTORS, L.P. who is personally known to me or who has produced _____ as identification.

_____
Signature of Notary Public

Name of Notary Public: Lewis Wilson III
Notary Commission Expires Date: 3/6/2024
Personally Known: _____X_____
OR Produced Identification: _____
Type of Identification Produced: _____

LEWIS WILSON, III
Notary Public, State of Texas
Comm. Expires 03-06-2024
Notary ID 132392944

All personally identifiable Information was
redacted prior to recording.

Page 1 of 1

Instr# 117380456 , Page 1 of 2, Recorded 06/28/2021 at 10:31 AM
Broward County Commission

Prepared By and Return To:

Collateral Department
Meridian Asset Services, LLC
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

_____ Space above for Recorder's use

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE TIKI SERIES IV TRUST**, whose address is **7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251**, (ASSIGNOR), does hereby grant, assign and transfer to **US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE BUNGALOW SERIES IV TRUST**, whose address is **7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251**, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: 2/19/2003
Original Loan Amount: $875,000.00
Executed by (Borrower(s)): **JOHN GLARENTZOS & MATINA GLARENTZOS**
Original Lender: **INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK**
Filed of Record: In Book/Liber/Volume 34907, Page 1611
Document/Instrument No: 102803830 in the Recording District of Broward, FL, Recorded on 4/9/2003.

Property more commonly described as: **932 N NORTHLAKE DRIVE, HOLLYWOOD, FLORIDA 33019**

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: 3/26/2021

**US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE TIKI SERIES IV TRUST, BY MERIDIAN ASSET SERVICES, LLC, ITS ATTORNEY-IN-FACT**

By: **MURAT DENIZ**
Title: **VICE PRESIDENT**

Witness Name: **DIEP DOAN**

Witness Name: **JOSEPH COUVERTIER**

Instr# 117380456 , Page 2 of 2, End of Document

> A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of     **FLORIDA**
County of    **PINELLAS**

On **3/26/2021**, before me, **JEFF G. JORDAN**, a Notary Public, personally appeared **MURAT DENIZ, VICE PRESIDENT** of/for **MERIDIAN ASSET SERVICES, LLC, AS ATTORNEY-IN-FACT FOR US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE TIKI SERIES IV TRUST**, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of **FLORIDA** that the foregoing paragraph is true and correct. I further certify the foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization and that MURAT DENIZ, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): **JEFF G. JORDAN**
My commission expires: 02/26/2024



SIGN AND RETURN

# Modification Agreement

This Modification Agreement is made as of April 25, 2007    by MATINA GLARENTZOS and IndyMac Bank F.S.B. hereinafter Lender.

Under a loan agreement dated February 19, 2003    , Lender agreed to make a loan (the "Loan") to Borrower. Lender and Borrower had agreed to modify the Loan as provided in the attached documents, which attached documents amend and restate the terms of the Loan. This Agreement and the attachments listed are Loan Documents.

As used here, the term "Loan Documents" means the Loan Agreement, the Note, the Security Instrument, and any other documents executed in connection with the Loan, including those which guarantee, secure or modify the Loan, as any or all of them may have been amended to date.

Borrower shall execute such documents as required by Lender in its sole and absolute discretion, in order to effectuate the modifications and evidence the authority of the Borrower to execute this Modification.

_____ 4-24-07
MATINA GLARENTZOS                  Date

_____
                                   Date

IndyMac Bank F.S.B.
A federally chartered savings bank

By: _____
Name:          Donald F. Voorhees
Title:         First Vice President
Date:

APR 2 6 2007

**ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE**
**NON-CONVERTIBLE 5/1 ONE-YEAR LIBOR FLEX PAY ARM**

Date:  February 19, 2003

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering, which is called the "Non-Convertible 5/1 One-Year LIBOR Flex Pay ARM." The interest rate and payment of this loan may each change during the term of this loan. THIS LOAN ALLOWS FOR NEGATIVE AMORTIZATION. Information on other ARM programs available from the lender will be provided upon request. This disclosure is not a commitment on the part of the lender to make a loan to you.

**HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED:**

• Your interest rate will be based on an index rate plus a Margin, rounded to the nearest .125%, unless your interest rate caps limit the amount of change in the interest rate. The "Margin" is the amount which will be added to the index rate to determine your interest rate. Once the Margin is established for your loan, the Margin will not change throughout the term of the loan. Please ask us for our current interest rates and Margins.

• Your initial interest rate will not be equal to an index rate plus a Margin. If the initial interest rate is below the then current index rate plus Margin (the "fully-indexed interest rate"), then the initial interest rate will be a "Discounted" interest rate. If the initial interest rate is above the then current fully-indexed interest rate, then the initial interest rate will be a "Premium" interest rate. Please ask us about the current Discount or Premium.

• Your index rate is based on the average of Interbank Offered Rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. If the index is no longer available, the lender will choose a new index based on comparable information. Since movement of the index is usually related to market conditions that cannot be predicted, it is impossible to know in advance exactly how much interest you will have to pay over the life of the loan. The index rate used in the examples below was in effect on December 1, 2006.

• When your interest rate changes, your new interest rate will equal the index rate plus the Margin unless your initial interest rate cap limits the amount of change in the interest rate.

• Your initial payment will be reduced by a pre-determined percentage of a fully amortized payment that will be based on the starting interest rate of the loan, the loan amount and the term of the loan. Please ask us about the current Payment Discounts. A Payment Discount is a calculated percentage reduction of the amount of the fully amortized payment based on the interest rate.

• At the first payment change, your new payment will be based on the interest rate (calculated by adding the index plus Margin), loan balance, and remaining loan term and then applying the predetermined Payment Discount, unless you have reached a re-amortization period or the maximum negative amortization amount as stated below.

**HOW YOUR INTEREST RATE CAN CHANGE**

Your interest rate will adjust 60 months after the first payment date and every 12 months thereafter to the index rate plus the Margin, subject to the following limits:

• Your interest rate will be rounded to the nearest one-eighth percent (.125%).

• Your interest rate may increase or decrease substantially over the life of the loan.

• On the first change date your interest rate cannot increase or decrease by more than 5.000 percentage points. Thereafter your interest rate cannot increase or decrease by more than 2.000 percentage points per adjustment (the "Periodic Interest Rate Cap").

• Your interest rate over the life of the loan cannot increase or decrease by more than 5.000 percentage points above the initial interest rate. Your interest rate will never be lower than the Margin.

• Approximately 15 days before each interest rate adjustment date, your new interest rate will be determined by adding the Margin to the then current index rate. This sum will be rounded to the nearest one-eighth percent (.125%).

**HOW YOUR PAYMENT CAN CHANGE**

Your payment may change on the 61st payment and will not change again unless the unpaid balance of your loan reaches either 110% or 115% depending on your loan's Maximum Negative Amortization Limit (please ask us about our current Maximum Negative Amortization Limit), or until you reach your 121st payment. Beginning with the 121st payment, your payment will adjust annually. Below is an example of initial interest rates, lifetime interest rate caps, Margins and Discounts.

• Your payment may increase or decrease substantially over the life of the loan.

• Your payment may change 60 months after your first payment date and will not change again unless the unpaid balance of your loan reaches either 110% or 115% depending upon your loan's Maximum Negative Amortization Limit (please ask us about our current Maximum Negative Amortization Limit) of the original loan amount or until you reach your 121st payment.

• Your new payment will be based on the then current interest rate, loan balance, and remaining loan term and then applying the pre determined Payment Discount. This is called the Minimum Monthly Payment. If you make only the Minimum Monthly Payment, your payment may increase substantially at the 121st scheduled payment or if you reach a balance of either 110% or 115% depending on your loan's Maximum Negative Amortization Limit (please ask us about our current Maximum Negative Amortization Limit),of the original loan amount.

FIMB Flex Pay 5/1 One-Year LIBOR ARM Disclosure

VMP Mortgage Solutions, Inc.

- At the 121st payment, your payments may adjust annually and will be based on the then current interest rate, loan balance, and remaining loan term. The required payment will be in an amount that would be sufficient to repay the unpaid balance in full on the Maturity Date in substantially equal installments at the rate in effect during the preceding month.

- If the monthly payment is not sufficient to cover the interest due, the difference will be added to your loan balance and will accrue additional interest. This is called "Negative Amortization."

- The unpaid balance of your loan can never exceed either 110% or 115%, depending upon your loan's Maximum Negative Amortization Limit, of original amount borrowed. If that limit is reached on or before your 120th payment, your monthly payment will be changed to an amount equal to the interest portion of the payment sufficient to pay off the unpaid principal balance over the remaining life of the loan at the interest rate in effect.

## DEFERRED INTEREST:

Deferred interest (also known as Negative Amortization) may occur in two ways:

- Because the payment is calculated using the pre determined Payment Discount payment which is less than the fully amortizing payment, the monthly payment may be insufficient to pay the interest which is accruing and/or

- Because the interest rate has the potential to increase annually after the first 60 months, but the payment changes are generally limited by the initial rate adjustment period and the payment is calculated using the predetermined Payment Discount, the monthly payment may be insufficient to pay the interest which is accruing;

If the interest due on your loan for a month is more than the required monthly payment, the entire payment will be applied to interest and any unpaid interest will be added to the loan balance. The interest for the next month is then calculated on the new increased loan balance.

The maximum Negative Amortization Limit ranges from either 110% or 115% of the original loan amount. Please ask us about the current Maximum Negative Amortization Limit. This means that at no time may your loan balance increase beyond 110% or 115% of the original loan amount.

"Accelerated Amortization" may occur if the interest rate decreases in those months that the interest rate changes but the payment does not change. "Accelerated Amortization" means you may pay more per month than what is required to pay off the loan in the remaining term. Therefore, you may possibly pay the loan off earlier than the original maturity of the loan.

## PAYMENT OPTIONS:

In addition to the Minimum Monthly Payment, you have two other options in making your payment. You may make a fully amortizing payment that is a payment that pays all the interest owed for the month plus principal or you may also choose to make a monthly "interest-only" payment. The fully amortizing payment and the interest-only payment are available only if the payment amount is greater than the Minimum Monthly Payment option. An interest-only payment amount will cover the full interest costs for that month; therefore, no additional (deferred) interest will be added to your loan balance. Your principal balance will not be increased or reduced. An interest-only payment is allowed until a fully amortizing payment is required as described above.

**IF YOU MAKE ONLY THE MINIMUM MONTHLY PAYMENT, YOUR PAYMENT MAY INCREASE SUBSTANTIALLY AT EACH OF THE SCHEDULED PAYMENT CHANGES OR WHEN YOU MAY REACH THE 110% OR 115% MAXIMUM BALANCE AT WHICH TIME YOUR PAYMENT WILL INCREASE SUBSTANTIALLY.**

## EXAMPLE 1 USING 110% MAXIMUM NEGATIVE AMORTIZATION LIMIT:

On a $10,000, 360-month loan with an initial interest rate of 7.250% in effect on December 1, 2006, the interest rate could rise to a maximum of 12.250%. The initial interest rate reflects a recent Discount of .750%, a Margin of 2.750% and an initial Payment Discount of 45% (your initial interest rate, Premium or Discount, Margin and Payment Discount may be different). The following worse case example illustrates what would happen to your payments if the interest rate increased to the maximum lifetime interest cap of 12.250% by the 3rd adjustment period and remained there for the term of the loan. The example uses a $10,000 loan amount, an initial interest rate of 7.250%, a lifetime interest cap of 12.250%, a Discount of .750% and a Margin of 2.750%. Your interest rate and maximum life of loan interest rate may be higher or lower.

| Loan Term | Initial Payment | Month in which balance reaches 110% of original principal balance | Maximum Payment | Month in which Maximum Payment is reached |
|---|---|---|---|---|
| 30 years | $37.52 | Payment 38 | $122.76 | Payment 121 |

In this example, the following occurs:

1. First payment is $37.52 which is 45% reduction of the fully amortized payment of $68.22.
2. On the 39th payment the loan would reach the maximum 110% of the original loan amount balance and the loan would change to an interest only payment of $66.31 based on an interest rate of 7.25% through the 60th payment.
3. On the 61st payment, the loan would change to an interest only payment of $112.03 based on an interest rate of 12.25% through the 120th payment.
4. On the 121st payment, the payment is $122.76. However, please note that the payment and the interest will continue to change beyond in the remaining term of the loan.

FiMB Flex Pay 5/1 One-Year LIBOR ARM Disclosure

It is important to note that the interest rate and payments will change differently on your loan depending on the change in the index throughout the life of your loan.

To see what your payments (excluding impounds or escrow payments for taxes, insurance and other purposes relating to the security property) would have been during that period, divide your mortgage amount by $10,000; then multiply the loan payment by the amount. For example, the initial monthly payment for a $100,000 loan would be:    $100,000 ÷$10,000 =10
10 x $37.52 =$375.20

## EXAMPLE 2 USING 115% MAXIMUM NEGATIVE AMORTIZATION LIMIT:

On a $10,000, 360-month loan with an initial interest rate of 7.250% in effect on December 1, 2006, the interest rate could rise to a maximum of 12.250%. The initial interest rate reflects a recent Discount of .750%, a Margin of 2.750% and an initial Payment Discount of 45% (your initial interest rate, Premium or Discount, Margin and Payment Discount may be different). The following worse case example illustrates what would happen to your payments if the interest rate increased to the maximum lifetime interest cap of 12.250% by the 3rd adjustment period and remained there for the term of the loan. The example uses a $10,000 loan amount, an initial interest rate of 7.250%, a lifetime interest cap of 12.250%, a Discount of .750% and a Margin of 2.750%. Your interest rate and maximum life of loan interest rate may be higher or lower.

| Loan Term | Initial Payment | Month in which balance reaches 115% of original principal balance | Maximum Payment | Month in which Maximum Payment is reached |
|-----------|-----------------|-----------------|-----------------|-----------------|
| 30 years | $37.52 | Payment 55 | $128.51 | Payment 121 |

In this example, the following occurs:

1. First payment is $37.52 which is 45% reduction of the fully amortized payment of $68.22.
2. On the 56th payment the loan would reach the maximum 115% of the original loan amount balance and then loan would change to an interest only payment of $69.41 based on an interest rate of 7.25% through the 60th payment.
3. On the 61st payment, the loan would change to an interest only payment of $117.28 based on an interest rate of 12.25% through the 120th payment.
4. On the 121st payment, the payment is $128.51. However, please note that the payment and the interest rate will continue to change beyond in the remaining term of the loan.

It is important to note that the interest rate and payments will change differently on your loan depending on the change in the index throughout the life of your loan.

To see what your payments (excluding impounds or escrow payments for taxes, insurance and other purposes relating to the security property) would have been during that period, divide your mortgage amount by $10,000; then multiply the loan payment by the amount. For example, the initial monthly payment for a $100,000 loan would be:    $100,000 ÷$10,000 =10
10 x $37.52 =$375.20

## NOTICE OF CHANGE

You will be notified in writing at least 25, but no more than 120, days before the due date of the first payment that will be at the new level. This notice will contain information about the current and prior index rates on which your current and prior interest rates are based, your current and prior interest rates, new payment amount and loan balance.

## ASSUMABILITY

Your loan is not assumable during the initial fixed interest rate period of the loan. During the adjustable interest rate period of the loan, your loan may be assumed subject to certain conditions and restrictions. The borrower who requests the assumption of your loan must qualify for the transaction under the then current underwriting guidelines and will be required to pay an assumption fee.

## PREPAYMENT FEE

Depending upon the interest rate and terms of your loan, your loan may have a prepayment fee. A prepayment fee is a charge that may be incurred for paying off your loan during the first three years or less of your loan term.   **THE PREPAYMENT FEE MAY BE SUBSTANTIAL. REQUIRE THAT YOUR LENDER PROVIDE YOU WITH LOAN TERM QUOTES FOR A LOAN WITH AND WITHOUT A PREPAYMENT PENALTY.** Please ask us if your loan has a prepayment fee.

I/We acknowledge receipt and have read the Adjustable Rate Mortgage Program Disclosure and the Consumer Handbook on Adjustable Rate Mortgages.

_____ 4-24-07 _____
Borrower MATINA GLARENTZOS          Date    Borrower          Date

_____                _____
Borrower          Date    Borrower          Date

_____                _____
Borrower          Date    Borrower          Date

**FIMB Flex Pay 5/1 One-Year LIBOR ARM Disclosure**

Date: February 19, 2003


**IndymacBank™**

---

## What You Need to Understand about the Loan Product You Have Chosen

You have applied for a FlexPay 5 /1 LIBOR Adjustable Rate Mortgage (ARM) loan in the amount of
$ 870,621.32 .

Below is a summary of key loan terms to assist you
in evaluating whether this mortgage product is right for your needs.

### *Don't decide on any loan unless you've reviewed and understood your disclosures.*

---

### Why do consumers choose the FlexPay Hybrid ARM (also known as a Hybrid Option ARM)?

The answer is payment flexibility combined with a fixed interest rate for the first 5 years. Most mortgage products offer just one principal and/or interest payment to make each month. The FlexPay Hybrid ARM provides up to three payment options to choose from each month. Note: the figures shown below are based on the currently proposed starting interest rate, and do not include any funds for payment of tax or insurance bills (or mortgage insurance premiums, if applicable):

| A Fully Amortizing Payment | $ 5,803.26 | (estimated – will vary each month) |
| An Interest Only Payment | $ 4,715.87 | (estimated – will vary each month) |
| The Minimum Payment | $ 3,191.79 | (this will be the minimum payment for up to 5 years) |

### About your interest rate:

- Your interest rate is fixed for the first 5 years of the loan at the interest rate specified in your Note. Currently, the Note interest rate being considered for your loan is 6.500 %. This rate may change prior to the closing of your loan. At the end of 5 years, and every year thereafter, the interest rate will be adjusted to a rate that is based on a moving index plus the Margin specified in your Note, rounded to the nearest .125%. This is called the "Fully Indexed Rate." As of March 21, 2007 , the index is equal to 5.235 % and the margin being considered for your loan is 2.750 %.
- Based on the Note interest rate currently under consideration, over the life of your loan your interest rate can rise to a figure as high as 11.500 % or fall as low as your Margin (currently 2.750 %).

### Potential Payment Shock:

As with all Adjustable Rate Mortgage (ARM) loans, your interest rate can increase or decrease. In the case of a FlexPay Hybrid ARM, your Minimum Payment can increase substantially after the first 5 years or if your loan balance rises to 110 % of the original amount borrowed, and this creates the potential for payment shock. Payment shock means that the increase in the payment is so significant that it can substantially affect your monthly cash flow.

If you are refinancing for the purpose of lowering your monthly payment, you should compare your current monthly payment to the Fully Amortizing Payment shown above.

### More Information About FlexPay Hybrid ARM Payment Choices:

**The Fully Amortizing Payment:**

The Fully Amortizing Payment is an amount sufficient to cover all of the interest due that month and reduce your mortgage loan balance over the term remaining on your loan based on the then current Fully Indexed Rate and outstanding balance. It will vary each month based on the outstanding balance, remaining life of the loan and the current interest rate being charged.

**The Interest Only Payment:**

The Interest Only Payment is an amount sufficient to cover all of the interest due that month, but it will not result in any reduction to your mortgage loan balance. It will vary each month based on the then current Fully Indexed Rate and outstanding balance. This payment option may only be chosen if it is greater than the Minimum Payment (defined below).

**The Minimum Payment (can cause negative amortization):**

The Minimum Payment will stay the same for the first 5 years of your loan term, or until your loan balance rises to 110 % of the original amount borrowed, which ever comes first. The Minimum Payment probably will not be sufficient to cover the interest due each month. That's because the Minimum Payment is initially set at a fraction of the initial Fully Amortizing Payment. It is currently proposed that your Minimum Payment be set at 55 % of the Fully Amortizing Payment. This figure is subject to change prior to your loan closing. If you choose to make the Minimum Payment when it is less than the Interest Only Payment your loan balance will increase. The difference between the amount of interest due that month and the Minimum Payment will be added to your outstanding balance. That process is called "negative amortization," and it means your loan balance goes up rather than down.

Your Minimum Payment is scheduled to change after 5 years. Your Minimum Payment can also undergo an unscheduled change, if your loan balance rises to 110 % of the amount originally borrowed. The actual amount of your new Minimum Payment may be significantly larger (50% or more) than your previous Minimum Payment (see the Frequency of Payment Changes section on Page 2 for further details.)

**End of Payment Option Period:**

After the 120th scheduled payment (10 years) your only payment option will be the Fully Amortizing Payment.

### If your loan carries a Prepayment Penalty!

Proposed Prepayment Penalty Duration: N/A Years. Prepayment penalties vary by state but can cost thousands of dollars if you prepay your loan before the prepayment expiration. We suggest you contact your loan officer to discuss how large your payoff penalty can be. If imposed, a prepayment penalty will apply regardless of the reason for early payoff; in other words, whether you pay your loan off due to the sale of the home or because you have refinanced your loan. You can choose a loan without a prepayment penalty, but it may mean your interest rate, margin and/or points may be higher. You should discuss this important loan term with your loan officer before rate locking your loan.

---

Date:  March,  2007

# Key Loan Terms and Definitions

| Loan Characteristic | Your Proposed Loan Terms | What This Means for You |
|---|---|---|
| Loan Amount | $ 870,621.32 | This is the amount of credit you requested. |
| Loan Purpose | RATE/TERM REFI | If Purchase: Your objective is the purchase of real property.<br>If Cash Out: Your objective is to draw cash from the equity in your mortgaged property.<br>If Rate/Term Refinance: Your objective is to lower your rate and/or improve other terms of your mortgage financing. |
| Loan Product | FlexPay Hybrid ARM | This is an adjustable rate mortgage (ARM) with an interest rate that is fixed for the first  5  years and then changes annually thereafter. The primary benefit of this product is that it offers you up to three payment options per month: a Fully Amortizing Payment (which covers all of the interest due and will reduce your loan balance), an Interest Only Payment (which covers all of the interest due but will not reduce your loan balance) and a Minimum Payment (the lowest payment available, which may cause your loan balance to rise because it does not cover all of the interest due). |
| Frequency of Interest Rate Changes | Fixed for the First 5 years; Annually Thereafter | Your interest rate may change at the end of  5  year(s) and every year thereafter. It can increase or decrease. Limits on the amount by which the interest rate can change are described in the Interest Rate sections below. |
| Minimum Payment | $  3,191.79 | The Minimum Payment is initially set at a fraction of the initial Fully Amortizing Payment. It is currently proposed that your Minimum Payment be set at   55   % of the Fully Amortizing Payment. This figure is subject to change prior to your loan closing. This payment amount may not be sufficient to cover all of the interest due each month. When this happens, the difference is added to your unpaid loan balance, a process known as Negative Amortization. So your loan balance will rise rather than fall. |
| Frequency of Payment Changes | **Scheduled: After First  5  Years** | Scheduled:  Your Minimum Payment will change after  5  years. The new Minimum Payment will be based on   55   % of the Fully Amortizing Payment, which is based on the outstanding balance and the Fully Indexed Interest Rate (calculated by adding the then current index and the margin) in effect after the first adjustment (as limited by the interest rate caps described below), over the remaining term. |
|  | **Unscheduled: If your balance rises to 110 % of your original loan amount** | Your Minimum payment can also undergo an unscheduled change, if your loan balance rises to  110  % of the amount originally borrowed through negative amortization. Your Minimum Payment will be increased to equal the then current Interest Only Payment.<br><br>As a result of these potentially dramatic changes to your Minimum Payment (possibly raising your payment 50% or more over your previous Minimum Payment) you may experience payment shock.  Payment shock means that the rise in the payment is so significant that it can substantially affect your monthly cash flow. |
| Payment Option Term | First 10 Years | After the 120th scheduled payment, only the Fully Amortizing Payment option will be available |
| Index to Be Used for the Loan | 1 Year LIBOR | Your index is the average of the Interbank Offered Rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal |
| Value of This Index as of 03/21/2007 | 5.235 % | The value of the index can change daily. If, at the time of your interest rate calculation, the value of this index has risen above the value used when your rate was last calculated, your Interest Only and Fully Amortizing payment amounts will also rise. In addition, increases in the index, combined with the use of the minimum payment amount can lead to additional negative amortization, and when your minimum payment is recalculated, the associated payment increase will be more dramatic and could cause payment shock, as described above. |
| Margin | 2.750 % | This is the Margin appearing on your loan record today. It may change prior to loan closing |
| Fully Indexed Interest Rate | 8.000 % | This is the sum of the Index plus your Margin, as of    03/21/2007    , rounded to the nearest .125%. This is how we will calculate your interest rate after your fixed rate period ends. This is for illustrative purposes, and the figure is based on the current index value and the Margin currently on your loan record.    The rate charged on your loan may be different based your final Margin, the current index, and the limits of the Interest Rate Caps described below. |
| Interest Rate Cap: First Adjustment Cap | 5.000 % | At the first interest adjustment (after   5   years) your interest rate may rise (or fall) by as much as    5.000% over (or under) the minimum Note interest rate but in no event shall your interest rate be lower than the margin. |
| Interest Rate Cap: Subsequent Annual Rate Cap | 2.000 % | After the first adjustment, each year your interest rate may rise or fall by no more than 2.000 % from the then-current interest rate. |
| Interest Rate Cap: Lifetime Cap | 11.500 % | Your interest rate may rise, but it will never be higher than the percentage shown here.  This is equal to the Note Rate of ( 6.500   %) plus the Lifetime Cap ( 5.000 %) |
| Interest Rate Cap: Floor Cap | 2.750 % | Your interest rate may fall, but it will never be lower than the amount of your Margin. Your current Margin is the figure shown here. It may change prior to closing. |
| Negative Amortization Cap | 110    % of loan amount or $ 962,500.00 | This is the limit placed on increases to your loan balance (resulting from Negative Amortization). Your balance will never exceed the figure shown here. |
| Prepayment Penalty – Duration | N/Xears | This is the period of time for which your prepayment penalty will apply. |
| The nature of the prepayment penalty | See Description at Right | Prepayment penalties vary by state but can cost thousands of dollars if you prepay your loan before the prepayment expiration. This penalty will apply regardless of the reason for early payoff: in other words, whether you pay your loan off due to the sale of the home or because you have refinanced your loan. You can choose a loan without a prepayment penalty, but it may mean your interest rate, margin and/or points may be higher. |
| P&I Payment Options (figures are estimates and do not include monthly taxes and insurance escrow amounts) | Fully Amortizing $ 5,803.26 | This is an illustration of the kinds of payment options you can choose from.  The fully amortizing and interest only payments will vary monthly, and the ones shown here are based on the Note interest rate proposed for your loan.  The difference between the Interest Only Payment and the Minimum Payment shows you the amount of Negative Amortization that would occur if you chose to make the Minimum Payment in the first month.  As you can see, the Fully Amortizing Payment (the one that would reduce your balance each month) can be hundreds of dollars more than the Minimum Payment. |
|  | Interest Only $ 4,715.87 |  |
|  | Minimum $ 3,191.79 |  |

**Acknowledgement:**

I (we) understand and accept these loan characteristics. The loan amount and loan purpose shown are accurate.  I (we) understand that for a full understanding of my (our) loan terms, I (we) must review the disclosures sent to me (us) by Indymac Bank, as well as the Note, Security Instrument, Truth in Lending Statement and the other documents that  I (we) will be presented with at my (our) loan closing.

_Marina Clarenzos_                 _4-24-07_                    _____
MATINA  CLARENZOS                   Date                              Date

_____                            _____
Date                                              Date

INSTR # 112484954, OR BK 51035 PG 1091, Page 1 of 6, Recorded 08/22/2014 at 12:05 PM, Broward County Commission Deputy Clerk ERECORD

Case 21-15007-PDR Doc 42 Filed 09/01/21 Page 54 of 66

**** FILED: BROWARD COUNTY, FL  Howard C. Forman,  CLERK 8/21/2014 12:37:05 PM.****

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA
CIVIL DIVISION
CASE NO. CACE 09 001231 (03)

ONEWEST BANK, FSB,

        Plaintiff,

vs.

MATINA GLARENTZOS AKA TINA
GLARENTZOS AKA STAMFIKE GLARENTZOS
AKA STAMATIKI GLARENTZOS AKA
STAMAFIKE GLARENTZOS AKA MARTINA
GLARENTZOS AKA STAMATIKE MATINA
GLARENTZOS; JOHN  GLARENTZOS;
CITIBANK, FEDERAL SAVINGS BANK;
UNKNOWN PERSON(S) IN POSSESSION OF
THE SUBJECT PROPERTY;
        Defendants.

_____/

*Consent*

## FINAL JUDGMENT OF MORTGAGE FORECLOSURE

THIS ACTION was heard before the Court. On the evidence presented, IT IS ADJUDGED that:

1.  There is due and owing to the Plaintiff the following:

|   |   |   |
|---|---|---|
| A. | As unpaid principal of the indebtedness agreed to be paid in the mortgage herein foreclosed and the note secured thereby | 904,421.50 |
| B. | Interest through 8/21/2014 | 265,588.71 |
| C. | Late Charges | 478.77 |
| D. | Advances by Plaintiff | 67,273.91 |

    Taxes              $72,421.61

| Year | Amount |
|------|--------|
| -2013 | $10,947.09 |
| -2012 | $10,720.90 |
| -2011 | $10,498.75 |
| -2010 | $10,379.23 |
| -2009 | $9,562.82 |
| -2008 | $9,236.45 |
| -2007 | $11,076.37 |

    Flood Insurance      $817.00
    Payments to Escrow  $(5,964.70)

File No  08-11030 OWB
V1 20140101

# EXHIBIT "B"

E.   Property Inspections      407.00

F.   BPO/Appraisal Fees      2,655.00

G.   Bankruptcy Fees/Costs      143.00

H.   Title Search      390.00

I.   Clerk's filing fee      346.00

J.   Service of process      250.00

**SUBTOTAL**   $    1,241,953.89

Attorney's fees $    1,300.00

Attorney's contested fees $    3,395.00

**TOTAL**   $    1,246,648.89

that shall bear interest from this date forward at the prevailing legal rate of interest. Plaintiff shall also recover such further costs as may be incurred by the Plaintiff in this action, including, but not limited to, the sale fee and publication of the Notice of Sale, and any advances made by the Plaintiff subsequent to the date specified in item C of this paragraph which are proper under the terms of the note and mortgage foreclosed herein.

2.     The Court finds that service of process was properly effected on each of the Defendants. Plaintiff holds a lien for the total sum superior to any claim or estate of MATINA GLARENTZOS AKA TINA GLARENTZOS AKA STAMFIKE GLARENTZOS AKA STAMATIKI GLARENTZOS AKA STAMAFIKE GLARENTZOS AKA MARTINA GLARENTZOS AKA STAMATIKE MATINA GLARENTZOS; CITIBANK, FEDERAL SAVINGS BANK; on the following property in Broward County, Florida:

> **LOT SEVEN (7) LESS THE NORTH 30 FT. THEREOF DEEDED FOR STREET RIGHT-OF-WAY, BLOCK SIXTY-SIX (66), HOLLYWOOD LAKES SECTION, PLAT BOOK 1, PAGE 32, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, AND ALSO ALL THAT PARCEL OF LAND DESCRIBED AND BOUNDED AS FOLLOWS: BEING A PART OF PIERCE STREET AND PART OF BLOCK SEVENTY (70) OF HOLLYWOOD LAKES SECTION, BOUNDED ON THE NORTH BY THE SO. LINE OF SAID LOT SEVEN (7), ON THE SO. BY BLOCK SEVENTY ONE (71), OTHERWISE DESCRIBED AS NORTH LAKE OF SAID HOLLYWOOD LAKES SECTION, ON THE EAST BY THE EAST LINE OF SAID LOT SEVEN (7), EXTENDED IN A SOUTHERLY DIRECTION AND ON THE WEST BY THE WEST LINE OF SAID LOT SEVEN (7) EXTENDED IN A SOUTHERLY DIRECTION AS SHOWN ON THE PLAT OF HOLLYWOOD LAKES SECTION, BEING ALL THAT PARCEL OF LAND LYING SOUTH OF SAID LOT SEVEN (7) EXTENDING TO SAID NORTH LAKE.**

If the total sum set forth in paragraph 1 with interest at the interest rate prescribed by law and all costs of this action and proper advances pursuant to paragraph 1 accruing subsequent to this judgment are not paid, the Clerk of this Court shall sell the property at public sale on _Jan 6_____, 2015 at 10:00 AM, to the highest bidder for cash, except as set forth (not less than 120) hereinafter, BY ELECTRONIC SALE AT: WWW.BROWARD.REALFORECLOSE.COM, in accordance with Section 45.031, Florida Statutes.

3.    Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the Clerk if Plaintiff is not the purchaser of the property at the sale, provided, however that the purchaser of the property shall be responsible for the documentary stamps payable on the certificate of title. If Plaintiff is the purchaser, the Clerk shall credit Plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment or such part of it as is necessary to pay the bid in full. If prior to the sale, Plaintiff shall be required to advance any monies pursuant to the provisions hereof, then Plaintiff or its attorneys shall so certify to the Clerk of this Court, and the amount due to Plaintiff as set forth in paragraphs 1 hereof shall be increased by the amount of such advances without further order of the Court. If Plaintiff is successful bidder at the sale, Plaintiff's rights as such may be assigned to a third party and, in that event, the Clerk of this Court is hereby ordered and directed to issue the Certificate of Title to Plaintiff's assignee upon application of Plaintiff and without further Order of this Court.

4.    On filing the Certificate of Title the Clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of Plaintiff's costs; second, documentary stamps affixed to the certificate unless Plaintiff is not successful bidder in which event the successful bidder shall pay the cost of said documentary stamps in addition to the amount bid; third, Plaintiff's attorneys' fees; fourth, the total sum due to Plaintiff less the items paid plus interest at the rate set forth in paragraph 1 hereof from this date to the date of the sale. All sums to be disbursed to Plaintiff shall be made payable to Plaintiff's Attorney, Kahane & Associates, P.A. Trust Account and mailed to 8201 Peters Road, Suite 3000, Plantation, FL 33324; and by retaining any amount remaining pending the further order of this Court.

5.     Upon issuance of the Certificate of Sale by the Clerk of the Court, the Defendant(s) and all persons claiming under or against them since the filing of the notice of Lis Pendens shall be foreclosed of all estate or claim in the property, except as to claims or rights under chapter 718 or chapter 720, Florida Statutes, if any. If the United States is a defendant herein, it shall have the right of redemption provided by 28 U.S.C. 2410(c) for the period provided therein, running from the date of Certificate of Sale. Upon the filing of the certificate of title, the person named on the certificate of title shall be let into possession of the property upon further order of the Court.   If any defendant remains in possession of the property, the clerk shall upon further order of the court issue forthwith a writ of possession upon request of the person named on the certificate of title for the premises located at: 932 N NORTHLAKE DR, HOLLYWOOD, FLORIDA 33019-.

6.     The court finds, based upon Florida Law, the affidavits filed herein, inquiry of counsel for the Plaintiff, and upon consideration of the legal services rendered, the complexity of the matter, the amount of time and labor reasonably expended by lawyers in the community prosecuting routine mortgage foreclosure actions and the flat fee agreement between counsel and Plaintiff, that the flat fee sought by Kahane & Associates, P.A. is reasonable and awards a flat fee of One Thousand Three Hundred Dollars and no Cents ($1,300.00).

7.     The court also finds, based upon Florida Law, the affidavits filed herein, inquiry of counsel for the Plaintiff, and upon consideration of the legal services rendered, the complexity of the matter, the amount of time and labor reasonably expended by lawyers in the community prosecuting routine mortgage foreclosure actions and the contested fee agreement between counsel and Plaintiff, that the contested fee sought by Kahane & Associates, P.A. is reasonable and awards a contested fee of Three Thousand Three Hundred Ninety Five Dollars and No Cents ($3,395.00).

8.     Jurisdiction of this action is retained to enter further orders as are proper including, without limitation, ~~a deficiency judgment~~. The retention of jurisdiction to enter deficiency judgments set forth, shall not apply if personal liability has been discharged under the provisions of the U.S. Bankruptcy code (11 U.S.C. § 101, et seq.). *Plaintiff will not seek a deficiency against defendant.*   SR   JRM

9.     Jurisdiction of this action is retained to allow for a supplemental complaint to add omitted parties post-judgment.

File No  08-11030 OWB
V1 20140101

10.    The rights of any tenant(s) residing in the above described real property are not those of a bona fide tenant under the provisions of the Protecting Tenants at Foreclosure Act or arise as a result of a tenancy at will and are subject to termination as provided by law.

11. <u>NOTICE PURSUANT TO AMENDMENT TO SECTION, 45.031, FLA. ST. (2006)</u>

IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.

IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE.  IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.  IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED.  PLEASE CHECK WITH THE CLERK OF THE COURT, 201 S.E. 6 STREET, FORT LAUDERDALE, FLORIDA 33301 (TELEPHONE: (954) 831-5745), WITHIN TEN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.

IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION. IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT LEGAL AID SERVICE OF BROWARD COUNTY, 609 SOUTHWEST FIRST AVENUE, FT. LAUDERDALE, FL 33301 PHONE: 954-765-8950, TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT

File No  08-11030 OWB
V1 20140101

ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL
AGENCY OR SUGGEST OTHER OPTIONS.  IF YOU CHOOSE TO CONTACT THE
BROWARDCOUNTY BAR ASSOCIATION LEGAL AID SOCIETY, YOU SHOULD DO SO
AS SOON AS POSSIBLE AFTER RECEIPT OF THIS NOTICE.

      DONE AND ORDERED in Chambers at Fort Lauderdale, BROWARD County, Florida,
this _____ day of _____, 2014.

_____
CIRCUIT JUDGE

Copies furnished to the parties listed on the attached service list:

Final Judgment
Case No  CACE 09 001231 (03)

KAHANE & ASSOCIATES, P A
8201 PETERS ROAD, STE.3000
PLANTATION, FL 33324
**Designated service email:** notice@kahaneandassociates com

MATINA GLARENTZOS
c/o JENNIFER M. BARROW, ESQ
1200 NW 78TH AVE., SUITE 300
MIAMI, FLORIDA 33126
efile@morrisdupont.com

UNKNOWN PERSON(S) IN POSSESSION OF THE SUBJECT PROPERTY
932  N NORTHLAKE DR
HOLLYWOOD, FLORIDA 33019

CITIBANK, FEDERAL SAVINGS BANK
c/o OFFICER, OR ANY INDIVIDUAL  AUTHORIZED TO ACCEPT SERVICE, as Registered Agent
8400 W BROWARD BLVD
FT. LAUDERDALE, FLORIDA 33324

File No  08-11030 OWB
V1 20140101

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
## www.flsb.uscourts.gov

In re:

Chapter 11
Case No.: 0:21-bk-15007-PDR

**STAMATIKE GLARENTZOS**,

Debtor.

_____/

## DECLARATION IN SUPPORT OF U.S. BANK
## TRUST, N.A., AS TRUSTEE OF THE BUNGALOW SERIES
## IV TRUST'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

1.     I, Jody Lee                    , declare and state as follows:

2.     I am over the age of eighteen years and not a party to this action. The facts set for the below are known to me personally based upon the review of the business records and I have first-hand knowledge of them. If called as a witness, I could and would testify competently under oath to such facts.

3.     I am a Bankruptcy Asset Manager   at SN Servicing Corporation, as servicer for U.S. Bank Trust, N.A., as Trustee of the Bungalow Series IV Trust ("Movant") and am familiar with the subject Mortgage and loan in favor of Movant, and the subject Bankruptcy case.

4.     I am familiar with the manner and procedure by which the records of Movant are obtained, prepared, and maintained. Those records are obtained, prepared, and maintained by employees or agents of Movant in the performance of their regular business duties at or near the time, act, conditions, or events recorded thereon. The records are made either by persons with knowledge of the matters they record or from information obtained by person with such knowledge. It is my business practice to maintain these records in the regular course of business.

# EXHIBIT "C"

5. Movant has been responsible for the handling of all matters relative to the underlying loan prior to the filing of the within motion, including but not limited to processing of all payments received, crediting of received payments, adding all proper charges to the loan, confirming the maintenance of hazard insurance and property taxes, property preservation where appropriate, communicating with and responding to the borrower on all matters relative to the loan, and the commencement of non-judicial foreclosure proceedings where appropriate. All activities on the loan advanced by U.S. Bank Trust, N.A., as Trustee of the Bungalow Series IV Trust were advanced in accordance with the terms of the Note and Mortgage.

6. Movant is the holder of the Note and the Mortgage by virtue of those Assignment(s) of Mortgage attached to the Mortgage. The Note, Mortgage and Assignment(s) of Mortgage constitute the Loan Documents (collectively, the "Loan Documents"). A true and correct copies of the Loan Documents are attached to the Motion as **Composite Exhibit "A"**.

7. The debtor Stamatike Glarentzos (the "Debtor") filed this instant Chapter 13 bankruptcy case on April 20, 2018.

8. The Proof of Claim related to the Note and Deed of Trust was filed on July 16, 2018, as Proof of Claim No. 4-1, evidencing a total claim of $1,584,306.04.

9. With respect to Movant's secured claim, as of May 23, 2021, the total payoff is $1,584,306.04 and the following monthly P&I payments and amounts are due and delinquent:

| Monthly payments: | (10/1/10 thru 5/1/12) | 20 at $3,191.79 = | $ 63,835.80 |
|---|---|---|---|
| Monthly payments: | (6/01/12 thru 5/1/13) | 12 at $3,005.87 = | $ 36,070.44 |
| Monthly payments: | (6/01/13 thru 5/1/14) | 12 at $2,805.48 = | $ 33,665.76 |
| Monthly payments: | (6/01/14 thru 5/1/15) | 12 at $2,605.08 = | $ 31,260.96 |
| Monthly payments: | (6/01/15 thru 5/1/16) | 12 at $2,805.48 = | $ 33,665.76 |
| Monthly payments: | (6/01/16 thru 5/1/17) | 12 at $2,306.26 = | $ 27,675.12 |
| Monthly payments: | (6/01/17 thru 5/1/18) | 12 at $7,087.51 = | $ 85,050.12 |
| Monthly payments: | (6/01/18 thru 5/1/20) | 24 at $7,565.36 = | $181,568.64 |
| Monthly payments: | (6/01/20 thru 5/1/21) | 12 at $6,831.41 = | $ 81,976.92 |

- 2 -

*Case No.:* 0:21-bk-15007-*PDR*

| | |
|---|---|
| Pre-petition fees due: | $ 49,123.60 |
| Escrow funds advanced: | $145,417.03 |
| Projected escrow deficiency: | $  9,665.56 |
| Less unapplied funds on hand: | -$  1,753.84 |

| | |
|---|---|
| **Total Delinquencies:** | **$ 777,221.87** |

10.    The sums set forth in this declaration do not include any late charges or other fees and charges that might otherwise be included in the event that a payoff is requested or provided.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  8/31/21         (Date) Eureka                          (City),  CA      (State)

_____
Signature

Jody Lee
_____
Print Name

- 3 -



| Site Address | 932 N NORTHLAKE DRIVE, HOLLYWOOD FL 33019 | ID # | 5142 14 02 3150 |
|---|---|---|---|
| Property Owner | GLARENTZOS, STAMATIKE GLARENTZOS, EVANGELIA JANE | Millage | 0513 |
| Mailing Address | 22 SW 11 ST #2 DANIA BEACH FL 33004 | Use | 01 |
| Abbr Legal Description | HOLLYWOOD LAKES SECTION 1-32 B LOT 7 LESS N 30 FOR ST,TR OF LAND LYING S OF LOT 7,BET LOT 7 & LAKE BLK 66 | | |

**The just values displayed below were set in compliance with Sec. 193.011, Fla. Stat., and include a reduction for costs of sale and other adjustments required by Sec. 193.011(8).**

\* 2021 values are considered "working values" and are subject to change.

| Year | Land | Building / Improvement | Just / Market Value | Assessed / SOH Value | Tax |
|---|---|---|---|---|---|
| 2021* | $442,410 | $1,061,630 | $1,504,040 | $616,660 | |
| 2020 | $442,410 | $1,045,830 | $1,488,240 | $608,150 | $12,146.22 |
| 2019 | $442,410 | $1,015,440 | $1,457,850 | $594,480 | $12,016.66 |

| 2021* Exemptions and Taxable Values by Taxing Authority | | | | |
|---|---|---|---|---|
| | County | School Board | Municipal | Independent |
| Just Value | $1,504,040 | $1,504,040 | $1,504,040 | $1,504,040 |
| Portability | 0 | 0 | 0 | 0 |
| Assessed/SOH  94 | $616,660 | $616,660 | $616,660 | $616,660 |
| Homestead  100% | $25,000 | $25,000 | $25,000 | $25,000 |
| Add. Homestead | $25,000 | 0 | $25,000 | $25,000 |
| Wid/Vet/Dis  1 | $500 | $500 | $500 | $500 |
| Senior | 0 | 0 | 0 | 0 |
| Exempt Type | 0 | 0 | 0 | 0 |
| Taxable | $566,160 | $591,160 | $566,160 | $566,160 |

| Sales History | | | |
|---|---|---|---|
| Date | Type | Price | Book/Page or CIN |
| 5/20/2021 | QCD-T | $100 | 117287929 |
| 7/1/1974 | WD | $74,000 | 5863 / 511 |
| 12/1/1972 | WD | $64,000 | |
| 10/1/1968 | WD | $9,500 | |
| 1/1/1963 | WD | $8,000 | |

| Land Calculations | | |
|---|---|---|
| Price | Factor | Type |
| $37.80 | 11,704 | SF |
| | | |
| | | |
| | | |

| Adj. Bldg. S.F. (Card, Sketch) | 4052 |
|---|---|
| Units/Beds/Baths | 1/4/2 |
| Eff./Act. Year Built: 1980/1973 | |

| Special Assessments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Fire | Garb | Light | Drain | Impr | Safe | Storm | Clean | Misc |
| 05 | | | | | | | | |
| R | | | | | | | | |
| 1 | | | | | | | | |

## EXHIBIT "D"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:

Chapter 11
Case No.: 0:21-bk-15007-PDR

**STAMATIKE GLARENTZOS**,

Debtor.
_____/

**ORDER GRANTING SN SERVICING CORPORATION,**
**AS SERVICING AGENT FOR U.S. BANK TRUST, N.A., AS TRUSTEE**
**OF THE BUNGALOW SERIES IV TRUST'S MOTION FOR RELIEF FROM THE**
**AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR ADEQUATE PROTECTION**

**THIS MATTER** came before the Court without necessity of a hearing upon SN Servicing Corporation, as Servicing Agent for U.S. Bank Trust, N.A., as Trustee of the Bungalow Series IV Trust's Motion for Relief From the Automatic Stay or, in the alternative, for Adequate Protection [D.E. ___] (the "Motion"). The Court, pursuant to Local Rule 2002-4, having considered this Motion without further notice or hearing as no party in interest has filed an objection within twenty-one (21) days from the date that the Motion was entered on the docket, and being otherwise duly advised in the premises, it is, hereby

**EXHBIT "E"**

**ORDERED,** as follows:

1.       The Motion is **GRANTED**, as set forth herein.

2.       The Automatic Stay as is lifted to allow SN Servicing Corporation, as Servicing Agent for U.S. Bank Trust, N.A., as Trustee of the  Bungalow Series IV Trust ("Secured Creditor"), so as to allow Secured Creditor to proceed to prosecute a mortgage foreclosure action in state court against real property and allow the state court to enter all necessary orders, judgments, and decrees associated therewith, on the real property with a legal description as follows:

**LOT SEVEN (7) LESS THE NORTH 30 FT. THEREOF DEEDED FOR STREET RIGHT-OF-WAY, BLOCK SIXTY-SIX (66), HOLLYWOOD LAKES SECTION, PLAT BOOK 1, PAGE 32, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, AND ALSO ALL THAT PARCEL OF LAND DESCRIBED AND BOUNDED AS FOLLOWS: BEING A PART OF PIERCE STREET AND PART OF BLOCK SEVENTY (70) OF HOLLYWOOD LAKES SECTION, BOUNDED ON THE NORTH BY THE SO. LINE OF SAID LOT SEVEN (7), ON THE SO. BY BLOCK SEVENTY ONE (71), OTHERWISE DESCRIBED AS NORTH LAKE OF SAID HOLLYWOOD LAKES SECTION, ON THE EAST BY THE EAST LINE OF SAID LOT SEVEN (7), EXTENDED IN A SOUTHERLY DIRECTION AND ON THE WEST BY THE WEST LINE OF SAID LOT SEVEN (7) EXTENDED IN A SOUTHERLY DIRECTION AS SHOWN ON THE PLAT OF HOLLYWOOD LAKES SECTION, BEING ALL THAT PARCEL OF LAND LYING SOUTH OF SAID LOT SEVEN (7) EXTENDING TO SAID NORTH LAKE.**

3.       This relief is *in rem* only in order to complete state court foreclosure proceedings through certificate of title and possession of the Property; however, Secured Creditor shall not seek any *in personam* relief against the debtor without further order of the Court.

4.       The Court waives the time requirements under Rule 4001(a)(3) and deems the relief from stay effective immediately.

5.       Secured Creditor is exempted from further compliance with Fed. Rule Bankr. P. 3002-1 in the instant bankruptcy case.

*Case No.: 0:21-bk-15007-PDR*

6.    The Court shall retain jurisdiction over this matter to consider and enter such further relief necessary to enforce the terms and conditions of this Order.

### ###

Submitted by:

**Christophal Hellewell, Esq**.
Florida Bar No. 114230
chellewell@ghidotiberger.com
**GHIDOTTI │ BERGER, LLC**
*Attorneys for Secured Creditor*
1031 North Miami Beach Blvd.
North Miami Beach, FL 33162
Telephone: (305) 501.2808
Facsimile: (954) 780.5578

<u>**Copies furnished to:**</u>
Christophal Hellewell is directed to serve a conformed copy of this order upon all interested parties and shall file a Certificate of Service within 3 days from the date of this Order.